UNITED STATES of America, Plaintiff,

v.

William V. MUSTO, Frank Scarafile, John J. Powers, Lawrence Dentico, Dominick D'Agostino, Gildo Aimone, Anthony Genovese and John Bertoli, Defendants.

No. 81–144.

United States District Court, D. New Jersey.

June 3, 1982.

W. Hunt Dumont, U. S. Atty. by Mary-anne T. Desmond, First Asst. U. S. Atty., Samuel Rosenthal, James Plaisted, Mark Malone, Richard Friedman, Asst. U. S. Attys., Newark, N. J., for plaintiff.

Irving Anolik, New York City, N. Y., for defendant William V. Musto.

Dennis McAlevy, Hoboken, N. J., for defendant Frank Scarafile.

Shain, Hayden, Perle, Rafanello, Schaffer & Irish by Joseph Hayden, Newark, N. J., for defendant John J. Powers.

Thomas Ford, Millburn, N. J., for defendant Lawrence Dentico.

Podvey & Sachs by J. Barry Cocoziello, and Alan Silber, Newark, N. J., for defendant Dominick D'Agostino.

Sills, Beck, Cummis, Radin & Tischman by Robert Baime, Newark, N. J., for defendant Gildo Aimone.

Flood & Basile by Raymond Flood, Hackensack, N. J., for defendant Anthony Genovese.

Robinson, Wayne, Greenberg, Levin, Riccio & LaSala by John D. Arseneault, Newark, N. J., for defendant John Bertoli.

SAROKIN, District Judge.

Defendants, alleging irregularities in the selection process for grand and petit jurors and for grand jury forepersons and deputy forepersons, seek to have the indictment against them dismissed. All of the defendants are white males over the age of 35. They make two contentions: first, that Blacks and Hispanics have been historically underrepresented in the grand and petit jury arrays of this district, and second, that Blacks, women, and persons under the age of 28 have been underrepresented in the positions of grand jury foreperson and deputy foreperson. Defendants allege that the disproportionate representation of these groups in the arrays and in the foreperson and deputy foreperson positions violates the fifth and sixth amendments to the United States Constitution and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861.

A hearing, lasting several days, was held to determine the validity of the defendants' factual allegations. The court received expert testimony on the methodology employed to establish the alleged disparities in representation and on the statistical significance of the disparities found. The court also heard testimony from social scientists, the United States Attorney, and several employees of the District Court Clerk's office on the significance of the role of the foreperson.

STANDING

 Although defendants are not members of the classes purportedly excluded from either the grand and petit jury arrays or from the foreperson and deputy foreperson positions, they nevertheless claim that they have standing under the fifth and sixth amendments and under 28 U.S.C. § 1861 to establish deficiencies in the juror and foreperson selection process. To determine whether a defendant has standing, the court must focus on whether the person whose standing is questioned is a proper party to request an adjudication of a particular issue and not on whether the issue itself is justiciable. *Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947 (1968). Resolution of this question is difficult because the same complexities and vagaries that generally inhere in other aspects of justiciability also surround questions of standing. *Id.* at 98, 88 S.Ct. at 1951. Nevertheless, analysis is simplified by making two inquiries: whether the party alleges that the challenged action has caused him injury in fact, economic or otherwise; and whether the interest sought to be protected by the complainant is arguably within the zone of interests sought to be protected or regulated by the statute or constitutional guarantee in question. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). These questions will be first considered with respect to defendants' sixth amendment claims.

 The sixth amendment guarantees to all criminal defendants the right to a "speedy and public trial, by an impartial jury." U.S.Const. amend. VI. An essential characteristic of an impartial jury is that its members are drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975). A defendant indicted by an unrepresentative grand jury, *cf. United States v. Layton*, 519 F.Supp. 946 (N.D.

Cal.1981), or convicted by an unrepresentative petit jury, *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), suffers injury because his constitutional and statutory rights to an impartial jury have been violated. The injury stemming from this defect in selection procedures casts doubt on the integrity of the judicial process. Therefore, a defendant has standing to challenge such violations under the sixth amendment even though he is not a member of the excluded or underrepresented class. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 695–96, 42 L.Ed.2d 690 (1975).

■ Similarly, defendants have standing under the Jury Selection and Service Act of 1968, to challenge unrepresentative grand or petit jury arrays. 28 U.S.C. § 1867. Standing to assert irregularities under the Act does not depend on whether the defendant is a member of the excluded or underrepresented class. *United States v. Marcano*, 508 F.Supp. 462 (D.P.R.1980). Thus, under both the sixth amendment and the Jury Selection and Service Act, defendants have standing to challenge the composition of grand and petit jury arrays.

Although defendants have standing to challenge the grand and petit jury arrays under the Constitution and under 28 U.S.C. § 1867, the government contends that defendants do not have standing under either source of law to challenge the exclusion of constitutionally cognizable groups from the positions of foreperson or deputy foreperson. Standing is lacking, the government argues, because the foreperson's duties are purely ministerial and do not have a significant impact on the fairness of the criminal justice system. Therefore, the values of a fair trial and of an untainted judicial process which underly sixth amendment challenges to the composition of jury arrays are not implicated where the claim of exclusion relates only to the foreperson or deputy foreperson positions.

■ The government's argument confuses standing with a disposition on the merits of defendants' claim. Defendants are contending that the institutional role of the foreperson is so substantial that the person filling the position has the power to alter the "unique qualities and characters of the jury's individual members." *United States v. Jenison*, 485 F.Supp. 655, 661–62 (S.D.Fla. 1979). If defendants succeed in proving that the foreperson position imbues its occupant with such overpowering influence, then it follows that the systematic exclusion of cognizable groups from the position without justification disturbs the values underlying the fair cross-section requirements of the sixth amendment and of 28 U.S.C. § 1861. Because sixth amendment values and the values underlying the Jury Selection and Service Act are arguably implicated by discrimination in the selection of forepersons, defendants have standing to proceed to the merits of their claim.

■ Although defendants have standing under the sixth amendment and under 28 U.S.C. § 1861, to contest irregularities in the composition of the grand and petit juries and in the selection of grand jury forepersons and deputy forepersons, they do not have standing to assert similar fifth amendment equal protection violations. Standing is lacking under the fifth amendment because defendants are not members of an allegedly excluded class. In *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the court, considering a challenge to the grand jury array brought under the equal protection clause of the fourteenth amendment, stated:

> [I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation *of his race or of the identifiable group to which he belongs.*

(emphasis supplied). The quoted language from *Castaneda* was cited with approval by the Court in *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979). In *Rose*, defendants, all of whom were Black, alleged that an equal protection violation had occurred with respect to the selection of grand jury forepersons. The Court found that a *prima facie* case of

discrimination had not been proven and reversed the appellate court.

Defendants argue that *Rose* is not applicable here and instead urge that *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), is controlling. In *Peters*, the Court held that a defendant need not be a member of an excluded class in order to challenge the composition of the grand jury that indicted him. Because the defendant in *Peters* was convicted at a trial that took place before the sixth amendment was incorporated into the due process clause of the fourteenth amendment, the Court could not rest its decision on sixth amendment grounds. Instead, the Court held that under the due process clause, a criminal defendant, whatever his race, would have standing to challenge the selection system for grand or petit juries if members of any race are arbitrarily excluded from service. *Id.* at 504, 92 S.Ct. at 2169. The Court reasoned:

> It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system or how that jury would have decided the case. Consequently, it is necessary to decide on principle which side shall suffer the consequences of unavoidable uncertainty. In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few.

*Id.* (citations omitted).

▆▆▆ Although the Court in *Peters* applied standing principles liberally under the due process clause, it specifically refused to consider defendant's equal protection claims. *Id.* at 497 n.5, 92 S.Ct. at 2165 n.5. Here, defendants' fifth amendment claim is asserted on equal protection grounds. Although the fifth amendment has no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228 n.2, 43 L.Ed.2d 514 (1975). Thus, where fifth amendment equal protection claims have been raised they have been approached in precisely the same way as equal protection claims under the fourteenth amendment. *Id.* A classification invalid under the equal protection clause of the fourteenth amendment then, will also be invalid under the due process clause of the fifth amendment. *United States v. Gordon-Nikkar*, 518 F.2d 972, 976 (5th Cir. 1975).

The approach of various courts to fourteenth amendment equal protection claims has been to require that the defendant be a member of the excluded class before his standing to assert the claim will be recognized. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). In a recently decided case, however, *United States v. Perez-Hernandez*, 672 F.2d 1380, 1386 (11th Cir. 1982), the Eleventh Circuit held that a defendant had standing under the fifth amendment to allege discrimination in the selection of grand jury forepersons even though the defendant himself was not a member of the class allegedly excluded. This conclusion was premised on the court's reading of *Peters v. Kiff* as an equal protection case. The court found that because the holding of *Peters*, "is clear and unambiguous and has never been expressly overruled," defendant had standing to assert a fifth amendment challenge to the selection of forepersons. This court agrees that the holding of *Peters* is "clear and unambiguous," but it is clearly and unambiguously premised on due process, not equal protection. The Court in *Peters* specifically stated:

> Accordingly, we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the

members of any race, *and thereby denies him due process of law.*

407 U.S. at 504, 92 S.Ct. at 2169. (emphasis supplied). The Supreme Court thus found that the defendant in *Peters* had standing to challenge irregularities in the selection of grand jurors on due process grounds and not, as the Eleventh Circuit has found, on equal protection grounds. This was recognized by Justice Rehnquist in *Duren v. Missouri*, 439 U.S. 357, 373, 99 S.Ct. 664, 673, 58 L.Ed.2d 579 (1979), where in a dissent critical of *Peters*, he stated: "Because the white defendant [in *Peters*] lacked standing to raise an equal protection challenge to the systematic exclusion of blacks from jury duty, the Court was forced to turn to the due process clause of the Fourteenth Amendment." In fact, as noted previously, the Court in *Peters*, itself, noted that it was not considering defendant's claims that his own rights under the equal protection clause had been violated. 407 U.S. at 497 n.5, 92 S.Ct. at 2165 n.5.

 In alleging that underrepresentation of cognizable groups in the jury selection process violates the equal protection clause, defendants are not really asserting their own rights but instead are asserting the rights of the excluded jurors. Under "pure standing" principles, therefore, defendants would not have standing to assert an equal protection violation. Nevertheless, the court must still consider whether defendants have *jus tertii*, or third party standing. Under the concept of *jus tertii*, a third party who suffers "injury in fact" has standing "to assert the constitutional rights of others where it would be difficult for the persons whose rights are asserted to protect themselves adequately by presenting their own grievance before an appropriate court." Tribe, American Constitutional Law, § 3–26. In deciding whether to apply third party standing principles, courts generally examine three factors: "the importance of the relationship between claimant and rightholders, the ability of rightholders to vindicate their own rights, and the risk

that the rights of third parties will be diluted." Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 441 (1974).

Defendants argue that *Peters* provides white defendants with standing to allege the violation of the constitutional rights of the excluded jurors. This argument, however, is premised on a misinterpretation of the case. In *Peters*, the defendant's own due process rights had been violated because he was denied a jury which was representative of the community. True, in asserting his rights, the defendant vindicated the integrity of the judicial process, but, if anything, this weakens the argument that standing must be conferred on defendants here, who are asserting equal protection violations. First, if the injury alleged is one to the integrity of the judiciary, then an action under the sixth amendment or under the Jury Selection and Service Act is available to redress the wrong.

Secondly, if the injury alleged is the stigma suffered by a member of the excluded class, injunctive relief is available to the class member under the fifth amendment, cf. *Brown v. Rutter*, 139 F.Supp. 679 (W.D. Ky.1956), or, if indicted, the excluded individual may also on equal protection grounds seek a dismissal of the charges. *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Because the injured party can seek for himself or herself a remedy for the alleged wrong, there is no justification for extending *jus tertii* principles to the facts of this case.

The court therefore concludes that a defendant does not have standing to assert a fifth amendment equal protection challenge if he is not a member of the allegedly underrepresented class. *Beal v. Rose*, 532 F.Supp. 306, 309–10 (M.D.Tenn.1981). See *Guice v. Fortenberry*, 633 F.2d 699, 703 (5th Cir. 1980); *United States v. Cross*, 516 F.Supp. 700, 706 (M.D.Ga.1981). Defendants here do not belong to the classes claimed to be underrepresented, and therefore lack standing to assert these claims.

## MERITS OF DEFENDANTS' CLAIMS

*Identification of Constitutionally Cognizable Classes*

 To establish a *prima facie* violation of the fair-cross-section requirement,[1] the defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to the systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Defendants have the burden of proof on each of these elements. *United States v. Butler*, 611 F.2d 1066, 1069 (5th Cir.) *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980).

 In considering a sixth amendment violation, the focus is on the issue of a fair cross section of the community and not on the issue of discrimination. *United States v. Jenison*, 485 F.Supp. 655, 660 (S.D. Fla.1979). Therefore, a defendant is not required to prove bad faith, and a *prima facie* showing of systematic exclusion may not be rebutted by proof of non-discriminatory intent. *Id.* It is also irrelevant that the exclusion of constitutionally cognizable groups was unintentional. *United States v. Holman*, 510 F.Supp. 1175 (N.D.Fla.1981). Once the defendants have made a *prima facie* showing of substantial underrepresentation, the state may only rebut the *prima facie* case by showing that a significant state interest is advanced by the procedure which results in the exclusion. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

Defendants contend that Blacks and Hispanic Americans have been underrepresented in the grand and petit jury arrays. These ethnic groups, defendants argue, are distinctive classes within the meaning of the test set forth above in *Duren*. Al-though there is no fixed definition of what constitutes a distinct group, factors which courts examine include:

> (1) the presence of some quality or attribute which 'defines and limits' the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a 'community of interest' which may not be represented by other segments of society.

*United States v. Test*, 550 F.2d 577, 591 (10th Cir. 1976).

 It is firmly established that Blacks, *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), and women, *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), are constitutionally cognizable classes. It is less clear, however, that Hispanic Americans are a distinct class. Defendants label as Hispanic any person who has identified himself or herself on the juror qualification form as being of Spanish, Latin, Hispanic, Cuban, or other Central or South American ethnicity. A similar grouping was rejected as overly broad in *United States v. Rodriguez*, 588 F.2d 1003, 1007 (5th Cir. 1979), where the Fifth Circuit affirmed a magistrate's report, which stated:

> there [is] simply no evidence upon which this Court could base a finding that persons of such diverse national origins as Cubans, Mexicans, and Puerto Ricans possess such similar interests th..t they constitute a cognizable group.

Although this court has doubts that defendants' definition of Hispanics meets constitutional standards for the identification of cognizable classes, it will nevertheless assume for purposes of analysis that the definition is appropriate. See *United States v. Gordon-Nikkar*, 518 F.2d 972 (5th Cir. 1975); *United States v. De La Rosa*, No. 80–276, slip op. (D.Mass. January 16, 1981).

 The court cannot, however, accept defendants' contention that persons aged 18 to 27 constitute a cognizable class. The

---

1. The "fair cross section" of 28 U.S.C. § 1861 is the functional equivalent of the "reasonably representative" standard of the Constitution. Therefore, the tests for showing underrepresen-tation under the Constitution and the statute are the same. *United States v. Test*, 550 F.2d 577, 584–85 (10th Cir. 1976).

persons within this proposed class neither share interests which may not be represented by other segments of the social milieu nor share attitudes or experiences unique from the rest of society. Other courts, also reaching this conclusion, have held that young persons are not a cognizable or distinctive class under the Jury Selection and Service Act or under the Constitution for purposes of challenging jury arrays. See, e.g., United States v. Potter, 552 F.2d 901, 909 (9th Cir. 1977); United States v. Test, 550 F.2d 577, 593 (10th Cir. 1976); United States v. Ross, 468 F.2d 1213, 1217 (9th Cir. 1972), cert. denied, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973).[2]

## THE STATISTICAL CASE[3]

### Grand and Petit Jury Arrays

■ Defendants contend that although Blacks comprise 13 per cent of the voting age population,[4] they account for only 7.6 per cent of the persons in the jury pool from which grand and petit juries are chosen. Statistically, this variation can be expressed as either an absolute disparity of 5.4 per cent or a comparative disparity of 41.5 per cent. The absolute disparity measures the absolute difference between the percentage of the cognizable class in question in the eligible population and the percentage of the same group within the master wheel. United States v. Facchiano, 500 F.Supp. 896, 898 (S.D.Fla.1980). The comparative disparity, on the other hand, measures the result obtained by dividing the

absolute disparity by the percentage of the cognizable class in question in the eligible population. Id. at 899 n.7. To illustrate, if Blacks comprised 60 percent of the eligible population and 50 per cent of the jury wheel, then the absolute disparity would be –10 per cent [50 per cent minus 60 per cent], and the comparative disparity would be –16.6 per cent [10 per cent divided by 60 per cent].

Where the eligible population in issue is relatively low, the comparative disparity will magnify the difference. Id. at 899. In Smith v. Yeager, 465 F.2d 272, 279 n.18 (3d Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972), the Third Circuit, recognizing that the comparative measure may distort reality, stated:

However, the comparative approach reaches absurd results in cases like Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414 (3d Cir. 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956), which considered racial discrimination in the Western District of Pennsylvania, where the Negro population at the time was 4.4% of the total, and Negro jury participation ranged as low as 2% of the jury list.

Similarly, the Eighth Circuit, in United States v. Whitley, 491 F.2d 1248, 1249 (8th Cir.), cert. denied, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974), recognized the weaknesses of the comparative measure:

2. Defendants urge that United States v. Butera, 420 F.2d 564 (1st Cir. 1970), requires this court to recognize young persons as constituting a cognizable class. In Butera, however, the class was composed of persons aged 18 to 35; here, the class consists of persons aged 18 to 27. Moreover, other courts which have considered whether young persons constitute a cognizable class have specifically rejected the reasoning of Butera. See, e.g., United States v. Potter, 552 F.2d 901, 905 (9th Cir. 1977).

Defendants also contend that Ciudadanos Unidos de San Juan v. Hidalgo County, 622 F.2d 807, 818–19 (5th Cir. 1980), cert. denied, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981) requires recognition of young people as constituting a cognizable class. In that case, however, the court found that the county plans in issue before it were distinguishable from the

above-cited decisions which dealt with challenges brought under the federal grand jury statutes.

3. The court has used 1980 census statistics in analyzing defendants' prima facie case. These statistics differ little from the 1970 statistics and do not alter the result that would be obtained by using the earlier statistics.

4. Because only those persons 18 years of age or older are eligible for jury service, 28 U.S.C. § 1865, it is appropriate to define the community in terms of the voting age population. See, e.g., United States v. Perez-Hernandez, 672 F.2d 1380, 1383 (11th Cir. 1982); United States v. Test, 550 F.2d 577, 582–83 (10th Cir. 1976).

The defendant characterizes the deviation in comparative terms and says that it exceeds 80%. While such a characterization may be proper where blacks constitute a significant proportion of the population, it is ordinarily inappropriate where a very small proportion of the population is black. A comparative characterization in such circumstances distorts reality.

*Id.* at 1249. (citations omitted). See also *United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir.), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980).

■■■■ Because Blacks in this district comprise a relatively small percentage of the eligible jury population, the court will focus on the absolute disparity to determine whether defendants have proven a *prima facie* violation of the fair-cross-section requirement of the Jury Selection and Service Act and the sixth amendment. The absolute disparity here is 5.4 per cent. This is not sufficient to establish a *prima facie* case of underrepresentation. In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), where equal protection violations were alleged, the Supreme Court held that a *prima facie* case of discrimination had not been shown where there was underrepresentation of an identifiable group by as much as 10 per cent. Although *Swain* was an equal protection case, other courts have held that an absolute disparity of 10 per cent or less, is insufficient to prove the *prima facie* elements of a fair-cross-section claim. *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.) *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *United States v. Test*, 550 F.2d 577, 587 (10th Cir. 1976). This court agrees with the reasoning of those courts and therefore finds that defendants have not established a *prima facie* case of underrepresentation of Blacks on the grand jury and petit jury arrays.

■■■■ Similarly, defendants have not shown that Hispanics have been underrepresented in the grand and petit jury arrays. Defendants contend that American citizens of Hispanic descent [5] comprise 5.3 per cent of the voting age population in this district, yet account for only 1.1 per cent of the jury pool. There is thus an absolute disparity of 4.2 per cent and a comparative disparity of 79.2 per cent.[6] Because Hispanics comprise a small percentage of the eligible population and because the absolute disparity is under 10 per cent, the court, again, finds that the *prima facie* elements of a fair-cross-section violation have not been proved.

Defendants contend that because voter registration lists are used to establish the jury pool from which grand and petit juries are chosen, Hispanics never will be fairly represented on juries in this district. This conclusion is drawn for two reasons: first, many Hispanics in the community, although citizens, have not registered to vote; and, second, many resident Hispanics are not citizens. Therefore, defendants argue that even though only citizens may serve on juries, 28 U.S.C. § 1865(b)(1), the fair-cross-section requirement of 28 U.S.C. § 1863(b)(3) is satisfied only when there is reflected in the arrays the percentage of all Hispanics in the district, voting and non-voting, and citizen and non-citizen. Defendants urge that a fair cross-section can be obtained only by supplementing the lists from which jurors are drawn.

■■■■ Defendants' argument is misplaced. In *United States v. Lewis*, 472 F.2d 252 (3d Cir. 1972), the Third Circuit held that the use of voter registration lists was a constitutionally acceptable method of selecting jurors. The court stated:

---

**5.** The community has been defined as consisting of American citizens of Hispanic descent because it is only citizens who have a right to vote and therefore serve as jurors. Even if the community is expanded, however, to include, as defendants suggest, all Hispanics, the difference does not aid defendants' *prima facie* case. See *infra.*

**6.** The absolute and comparative disparities set forth in the statistician's supplemental affidavit of October 9, 1981, have been adjusted to correct an arithmetic error in the affidavit. The adjustment, however, has no effect on defendants' *prima facie* case.

[A] group of persons who choose not to vote do not constitute a 'cognizable group.' Further, their non-registration is a result of their own inaction; not a result of affirmative conduct by others to bar their registration. Therefore, while a fairer cross section of the community may have been produced by the use of 'other sources of names,' the Plan's sole reliance on voter registration lists was constitutionally permissible.

*Id.* at 256. (emphasis in original). If non-voting citizens are not a cognizable class, aliens *a fortiori* are not a cognizable group. See *United States v. Gordon-Nikkar*, 518 F.2d 972, 977–78 (5th Cir. 1975). Moreover, even if the court were to accept defendants' contention that the relevant population is the entire Hispanic community, a *prima facie* case of underrepresentation still would not have been shown. Hispanics comprise 8.6 per cent of the population in this district and 1.1 per cent of the jury pool is Hispanic. Therefore, the absolute disparity is only 7.5 per cent and is insufficient to establish a violation of the fair-cross-section standard.

*Forepersons and Deputy Forepersons*

Defendants contend that from April 1976 to July 1981, judges in this district selected 25 grand jury forepersons and 25 deputy forepersons. Of this number, two forepersons and two deputy forepersons were Black. Blacks of voting age comprise 13 per cent of this district's population. Therefore, as to both forepersons and deputy forepersons, there is a 5 per cent absolute disparity. A disparity of such low magnitude is insufficient to establish a *prima facie* showing of underrepresentation. *Cf. Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965).

A stronger showing has been made, however, with respect to the underrepresentation of women. Of the 25 forepersons and 25 deputy forepersons selected over the five-year period, only two forepersons and three deputy forepersons were female. In this district, women comprise 52 per cent of the voting age population. Therefore, as to forepersons, the absolute disparity is 44 per cent and the comparative disparity is 84.6 per cent, and, as to deputy forepersons, the absolute disparity is 40 per cent and the comparative disparity is 77 per cent. If forepersons were selected at random, the chances are less than one out of 10,000 that only two of the 25 persons selected for the position would be female. Similarly, chances are less than one out of 10,000 that only three of the 25 persons selected for the deputy foreperson position would be female if the process were purely random.

Although defendants have offered strong proof that women have been underrepresented in the foreperson and deputy foreperson positions in this district, the government alleges that defendants' proofs are flawed. The government first contends that the size of the sample used is too small to establish statistically significant disparities. In support of this contention, the government cites *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In *Rose*, defendants alleged that for the period 1951–1973 there was discrimination in the selection of state grand jury forepersons. Although the period under scrutiny in *Rose* was substantially longer than the five-year period examined here, defendants in *Rose* were unable to adduce proof that no Black had served as foreperson for several of the years in question. *Id.* at 571, 99 S.Ct. at 3008. In addition, there was no proof as to the total number of foremen appointed during the period examined. *Id.* The Court noted, however, that the state forepersons were appointed for two-year terms and could be reappointed to additional terms without limitation. The Court therefore concluded that too few persons served as forepersons during the critical period for statistically significant inferences to be drawn. *Id.* at 571–72, 99 S.Ct. at 3008.

Here, the situation is significantly different. Defendants have examined jury records over a five-year period and have accounted for each person chosen to serve as foreperson or deputy foreperson at the time of each grand jury's empanelment. Statisticians testified that the sample drawn was large enough to allow statistically significant conclusions to be drawn.

**358**

Although the government urges that in some cases the individual selected to serve as foreperson did not serve for the life of the grand jury, it has not offered sufficient proof to challenge the accuracy of defendants' data. Moreover, Rule 6(c) of the Federal Rules of Criminal Procedure provides that the deputy foreperson shall serve as foreperson during the foreperson's absence. It is therefore reasonable to assume that if the foreperson leaves the grand jury permanently, he or she will be replaced by the deputy. Here, even if every foreperson resigned and were replaced by the deputy, there would be only five females among the 50 persons who, at some time, occupied the position. Thus, there would be a 42 per cent absolute disparity. In addition, if the court were to assume that there was turnover in the foreperson position only on those grand juries where there were women deputy forepersons, then only five of the 28 persons who occupied the foreperson position would be female. In that case, there would be a 34.2 per cent absolute disparity. The court therefore finds that even were it to accept the government's contention that there has been turnover in the foreperson position after initial selections have been made, it cannot conclude, without further proof, that defendants' *prima facie* case is affected.

■ The government also contends that it is inappropriate to measure disparities in the jury arrays or in the foreperson position by using the entire voting age population as a statistical base. Instead, the government argues that the relevant community for measuring disparities in the array consists of those persons eligible for jury service, and the relevant community for determining underrepresentation in the foreperson position consists of those persons eligible to serve as foreperson.[7] Although some refinement in the statistics used to establish the relevant community might yield more accurate results, courts have accepted general population statistics as appropriate for measuring disparities in the jury arrays, *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), or in the foreperson position. *United States v. Perez-Hernandez*, 672 F.2d 1380, 1383 (11th Cir. 1982). Therefore, the court finds that use of the voting age population is an acceptable means of defining the community against which disparities are measured.

■ Finally, the government, through its cross-examination of defendants' statistical expert, suggests that it is inappropriate to group together the forepersons selected by seven different judges acting independently of one another. Defendants' statistician testified, however, that such a grouping was mathematically appropriate. Moreover, the Jury Selection and Service Act declares that all litigants have a right to grand and petit juries drawn from a fair cross-section of the community "in the district or division where the court convenes." 28 U.S.C. § 1861. Defendants' contention that forepersons in this district have not been representative of the community is premised upon rights conferred by the Act. Defendants' argument, therefore, is not that forepersons are unrepresentative of the grand juries from which they are drawn, but instead that forepersons are not representative of the population in the district. Other courts, considering identical challenges, have found it acceptable to group together the forepersons selected by the judges of the district in which the challenge was made and to measure variations against the general population of the district. See, *e.g., United States v. Perez-Hernandez*, 672 F.2d 1380, 1383 (11th Cir. 1982); *United States v. Breland*, 522 F.Supp. 468 (N.D.Ga.1981); *United States v. Manbeck*, 514 F.Supp. 141 (D.S.C. 1981); *United States v. Holman*, 510 F.Supp. 1175 (N.D.Fla.1981); *United States v. Jenison*, 485 F.Supp. 655 (S.D.Fla.1979).

---

7. The government's contention that the composition of the group of forepersons should be measured against the composition of the grand jury arrays instead of the general voting age population misses the gist of defendants' argument. Defendants are contending that the forepersons are not representative of the community at large. If defendants' argument has merit, then it is the general voting age population which forms the relevant community.

This court agrees that it is appropriate to combine into one group all of the forepersons selected by the judges of this district from April 1976 to July 1981. Such a grouping is arguably consistent with the policies underlying the sixth amendment and the Jury Selection and Service Act. Therefore, because the government has failed to convince the court that there are deficiencies in the methodology employed by defendants to prove that women have been underrepresented in the foreperson position, the court finds that a *prima facie* statistical case has been proven.

*Significance of the Foreperson and Deputy Foreperson*

█ Although defendants have demonstrated that women have been underrepresented in the foreperson and deputy foreperson positions, the court must still determine whether the positions are of such significance that an unjustified exclusion of women must result in the dismissal of the indictment. Under Rule 6(c) of the Federal Rules of Criminal Procedure, the foreperson and deputy foreperson are appointed by the court. The Rule provides that the foreperson has power to administer oaths, to sign indictments, to keep a record of the number of jurors concurring in the finding of every indictment or to appoint another juror to keep such a record, and to file the record with the clerk of the court. In this district, the foreperson also asks witnesses to produce records, requests witnesses to submit to examination, and excuses witnesses after examination is complete. The duties of the foreperson are therefore purely ministerial. *United States v. Cross*, 516 F.Supp. 700 (M.D.Ga.1981). Nevertheless, defendants

contend that the administrative responsibilities of the foreperson and the appointment of the foreperson by the judge in the presence of the other jurors, confer upon the occupant of the position power and influence not held by other jurors. This added power and influence, defendants argue, translates into between three to five votes. Therefore, under defendants' reasoning, even if the grand jury arrays in this district are mirror images of the community, the fair-cross-section requirement is disturbed by the appointment of an excessive number of males as forepersons.

In support of this theory, defendants adduced testimony of social psychologists, who testified that the foreperson is perceived by other jurors as having special influence. This influence derives from several bases of social power identified by social psychologists. The types of power include: legitimate power, through which the person within the group grants the leader the right to influence him or her; expert power, through which the leader is seen to have special knowledge; information power, through which the leader is seen as having special information about the specific case; and coercive power, through which the leader has control of reward and punishment for the group and its members.

Dr. John McConahay, a social psychologist, testified that when the judge, who is viewed by the jury as being neutral, knowledgeable in the law, fair, and just, chooses a foreperson in the presence of the other jurors, he confers upon the person selected legitimacy. The foreperson's legitimate power is then enhanced by his performing purely ministerial acts, such as administering oaths and signing indictments.[8] This

---

8. Defendants also sought to prove that the foreperson had other powers in addition to those designated in Rule 6(c), including the power to excuse other jurors in emergencies, to question witnesses before the other jurors have an opportunity to do so, to initiate discussions during deliberations, and to return the indictment to the judge or magistrate in open court. These additional responsibilities were outlined in a model charge supplied to the judges of this district by the Clerk's office. Although an official from the Clerk's office testified that the

charge was read by the judge to the grand jury, she was unable to say whether it was read in its original form or was modified by each judge. Defendants have therefore failed to prove that additional responsibilities outlined in the charge were conferred upon all forepersons in the district. Thus, the court cannot accept defendants' contentions that these added responsibilities contributed to the foreperson's power.

Defendants also contend that grand juries of this district meet in a room where the foreper-

legitimate power of the foreperson, it is contended, also results in the attribution to him of other bases of social power. For example, other members of the jury may perceive that the foreperson is an expert because he is selected by another perceived expert, the judge.

Although Dr. McConahay's findings may have some support in the literature of social psychology, they cannot be accepted by this court. Dr. McConahay testified that he had never served on a grand jury, been present while a grand jury conducted its business, been present at an empanelment, heard a grand jury instructed, seen a foreperson selected, or participated in any way whatsoever in the business of a grand jury. In fact, Dr. McConahay's only direct knowledge of the way in which grand juries function was through a reading of a transcript of grand jury proceedings in Florida and the deposition of a single grand jury foreperson in an unrelated action, who testified that he sought to control other grand jurors.

The acts of the foreperson studied by Dr. McConahay in his review of the Florida transcript were strictly those relating to the federal foreperson's interrogation of witnesses. The practice in this district, however, according to the testimony of former United States Attorney, William Robertson, is to have the grand jurors direct their questions through the prosecuting attorney. Therefore, because the foreperson in this district does not directly interrogate witnesses, the transcript studied by Dr. McConahay has little relevance here. In addition, Dr. McConahay's study of the deposition testimony is of questionable relevance. Although the foreperson testified that he sought to control other jurors, Dr. McConahay could not say whether the foreperson was evidencing leadership behavior because of his position or whether the foreperson was asserting control over other jurors to fill his own psychological needs. The court, therefore, cannot conclude that Dr. McCo-

nahay's study of the foreperson's deposition is of any relevance here.

Although the court cannot conclude from the testimony adduced at the hearing that the foreperson position is of constitutional significance, defendants urge that the Supreme Court's decision in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), compels this conclusion as a matter of law. In *Rose*, the four defendants, all of whom were Black, alleged that their due process rights under the fourteenth amendment were violated because there had been a pattern of discrimination in the selection of Tennessee grand jury forepersons. The Court held that defendants had not proven a *prima facie* statistical case and dismissed their claims. In a footnote, however, the Court stated:

> In view of the disposition of this case on the merits, *we may assume without deciding* that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire.

*Id.* at 551–52 n.4, 99 S.Ct. at 2998 n.4 (emphasis supplied) (citations omitted).

Although the Court's statement in *Rose* was merely dictum, it has been relied upon by courts which have concluded that the foreperson occupies a constitutionally significant position. See, *e.g., United States v. Perez-Hernandez*, 672 F.2d 1380, 1386 (11th Cir. 1982) (foreperson significant under fifth amendment); *Guice v. Fortenberry*, 661 F.2d 496, 499 (5th Cir. 1981) (foreperson significant under fifth amendment); *United States v. Breland*, 522 F.Supp. 468, 478 (N.D.Ga.1981) (foreperson significant under fifth amendment); *United States v. Manbeck*, 514 F.Supp. 141, 148 (D.S.C.1981) (foreperson significant under fifth amendment); *United States v. Holman*, 510 F.Supp. 1175, 1178 (N.D.Fla.1981) (foreperson significant under fifth and sixth

---

son occupies an elevated seat, similar to a judge's bench. This seating arrangement, it is argued, enhanced the perceived power of the foreperson. Because all grand juries did not

use the specially designed room, the court cannot rely upon such evidence in arriving at its findings of fact and conclusions of law.

.

amendments); *United States v. Jenison*, 485 F.Supp. 655, 661 (S.D.Fla.1979) (foreperson significant under fifth amendment). This court believes that this reliance is misplaced. First, as already noted, the Court's language in *Rose* was merely dictum. Second, and most importantly, *Rose* involved a challenge to Tennessee grand jury forepersons, whose responsibilities are different from those of federal grand jury forepersons. See *United States v. Cross*, 516 F.Supp. 700, 704–05 (M.D.Ga.1981). In Tennessee, for example, the foreperson is not selected from a randomly drawn venire but instead is appointed by the judge from the public at large. The foreperson is selected for a term of two years and is often reappointed for additional terms. In *Rose*, one foreperson had served for five or six years, and another had served for several years in addition to substituting for the regular foreperson during times of illness. The federal grand jury foreperson, on the other hand, serves for no more than 18 months,[9] Fed.R.Crim.P. 6(g), and is selected by the judge from a randomly drawn group. Therefore, there is much greater likelihood that in Tennessee the grand jury foreperson will be perceived by other jurors as an expert than there is in the federal system.

In *Rose*, the Court described other duties of the grand jury foreperson under the laws of Tennessee:

> He or she is charged with the duty of assisting the district attorney in investigating crime, may order the issuance of subpoenas for witnesses before the grand jury, may administer oaths to grand jury witnesses, must endorse every bill returned by the grand jury, and must present any indictment to the court in the presence of the grand jury. The absence of the foreman's endorsement makes an indictment 'fatally defective.'

*Id.*, 443 U.S. at 548 n.2, 99 S.Ct. at 2996 n.2.

In contrast, in this district the questioning of witnesses is generally done by the United States Attorney, and the grand jury foreperson has no subpoena power. In addition, federal courts have recognized that the failure of the federal foreperson to discharge his duties is not fatal to the validity of the indictment. Therefore, where the foreperson failed to keep a record of those persons concurring in the indictment, *United States v. Parker*, 103 F.2d 857, 860 (3d Cir.), *cert. denied*, 307 U.S. 642, 59 S.Ct. 1044, 83 L.Ed. 1522 (1939), or failed to sign an indictment, *Frisbie v. United States*, 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657 (1895); *cf. United States v. Long*, 118 F.Supp. 857, 860 (D.P.R.1954), the indictment was not invalidated. Because the federal foreperson's duties are less substantial than the Tennessee foreperson's, there is less danger that the federal foreperson will have special influence over the deliberative process of the grand jury. See *United States v. Cross*, 516 F.Supp. 700, 705 (M.D.Ga.1981). For the foregoing reasons, the court finds that the decision in *Rose*, does not require this court to conclude that the position of federal grand jury foreperson is one of constitutional significance.

In so holding, the court is not unmindful of the Fifth Circuit's recent decision in *Guice v. Fortenberry*, 661 F.2d 496 (5th Cir. 1981). In *Guice*, the court stated, "If convictions must be set aside because of taint of the grand jury, we see no reason to differentiate the result because discrimination affected only the foreman." *Id.* at 499. *Guice*, however, involved a fourteenth amendment equal protection challenge to Louisiana grand jury forepersons by two Black defendants. Sixth amendment claims were not asserted in the case. In addition, in declaring the foreperson position one of constitutional significance, the court followed the dictum of *Rose v. Mitchell*, without elaboration. Here, the court has held that white defendants do not have standing to allege fifth amendment equal protection violations with respect to the foreperson position. Therefore, the only question before the court is whether under

---

**9.** Under Rule 6(g), a grand jury may serve for a maximum of 18 months. Although it is conceivable that the foreperson could be randomly selected to serve again as a grand juror, and subsequently be appointed foreperson for a second time, such an event is highly unlikely.

the sixth amendment and the Jury Selection and Service Act forepersons occupy positions of significance. The decisions of other courts, holding that for equal protection purposes, forepersons occupy constitutionally significant positions are thus not applicable here. An equal protection violation is substantially different from a fair-cross-section violation. In equal protection matters, the focus is on purposeful discrimination. *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). In fair-cross-section cases, however, the focus is not on discriminatory conduct but instead is on whether the jury selection system is impartial and will yield a microcosm of the community which can fairly represent the views of all persons within the society. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Therefore, to prove in a fair-cross-section case that the foreperson occupies a position of constitutional significance, the values underlying the fair-cross-section requirement must be tainted by the underrepresentation of cognizable classes in the position. Here, this has not been demonstrated. Defendants have not shown that the foreperson has the power to alter the "unique qualities and characters of the jury's individual members." *United States v. Jenison*, 485 F.Supp. 655, 661–62 (S.D.Fla.1979).

Recently, in *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir. 1982), the Eleventh Circuit also agreed that under the sixth amendment the foreperson's role is not one of constitutional significance. The court reasoned that because the foreperson alone could not represent the divergent views of the community, the position was not of special importance. *Id.* at 1385. Although this court agrees with the Eleventh Circuit's conclusion, it differs with the Circuit Court's reasoning. Defendants do not contend that the foreperson, by himself or by herself, represents a cross-section of the community. Rather, defendants argue that the foreperson has one viewpoint and that this viewpoint has greater influence in the deliberative process than the viewpoints of other jurors. It is therefore the dispropor-

tionate influence of the foreperson that taints sixth amendment values and not that the foreperson represents many viewpoints. Here, the court finds, however, that the foreperson does not have disproportionate influence in the deliberative process. Therefore, the position is not of constitutional significance.

In *United States v. Cabrera-Sarmiento*, 533 F.Supp. 799 (S.D.Fla.1982), the court also concluded that the foreperson position was not one of significance under the sixth amendment:

> When a group as a whole is excluded or significantly underrepresented on a jury, the defendant is denied the attitudes, experiences, outlook, and accumulated wisdom of that group. The relevance of the similar question to the office of foreperson, however, is not so clear. Assuming a fair cross-section on the jury as a whole, the defendant enjoys the richness of the community's general make-up, even where certain groups are underrepresented as forepersons. The benefit of the fair cross-section to the defendant is destroyed only if the 'impact of the grand jury foreperson is so substantial as to influence or alter the unique qualities and characteristics of the jury's individual members.'

*Id.* at 808. (citations omitted).

This court concludes that sixth amendment values and the policies underlying the Jury Selection and Service Act are not disturbed where jury arrays are representative of the community yet there is underrepresentation in the foreperson position. If defendants had demonstrated that the law has created a position which endows persons selected as forepersons with such overpowering influence that the views of other jurors are diminished substantially during the deliberative process, then there would be cause for concern that the values underlying the fair-cross-section requirement were being threatened. No such proof has been offered, however, that convinces the court that the foreperson's role is of such great significance. Although the foreperson may be clothed with legitimacy

because he or she is appointed by the court, it does not necessarily follow that the foreperson will dominate deliberations or that his or her views will receive greater weight than the views of the other grand jurors. Individuals beside the foreperson may have power. Some individuals have power because they are charismatic, others have power because they have expertise in a given area, and still others have power because they have pleasant or domineering personalities. The fair-cross-section requirement does not contemplate that all persons serving on juries or on grand juries will have equal influence. The standard only contemplates that the juries will be representative of the communities from which they are drawn. Here, there has been no showing that the jury arrays are deficient.

The grand jury process is an essential part of our criminal justice system. It removes from the hands of the prosecution the right to determine who shall and who shall not be prosecuted. Because of its importance, most of the concepts which mandate the representative character of petit juries have been applied to grand juries as well.

The determination of whether a person should be put to trial and the trial itself are to be judged by jurors which represent a fair cross-section of the community. A failure to convene representative juries may deprive a person of fundamental constitutional rights.

It is for this reason that the selection of juries and forepersons must be carefully scrutinized so that the balance created by random selection will not be undone. However, in our desire to protect the integrity of the system we must not be quick to find an imbalance where none exists. Grand jury forepersons are selected from a group of persons who themselves represent a fair cross-section of the community. The mere selection of that person by the court does not alter the representative character of the grand jury.

■ Defendants seek a dismissal of the indictment fairly returned by a properly constituted grand jury. Before this court should set aside the acts of such a revered body, the justification should be clear and the need manifest. There is nothing before this court which would justify it in holding that the selection of grand jury forepersons by the judges of this court rendered the grand juries unrepresentative or caused an imbalance on the scales of justice.

For these reasons the motion to dismiss the indictment on the grounds asserted are denied.